# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  November 21, 2024

Mr. Mark R. Brown
303 E. Broad Street
Columbus, OH 43215

Mr. Stephen Chang
Sidley Austin
555 California Street
Suite 2000
San Francisco, CA 94104

Ms. Kelsi Brown Corkran
Institute for Constitutional Advocacy and Protection
600 New Jersey Avenue, N.W.
Washington, DC 20001

Ms. Elizabeth Cruikshank
Institute for Constitutional Advocacy and Protection
600 New Jersey Avenue, N.W.
Washington, DC 20001

Ms. Madison Ferraro
Sidley Austin
555 California Street
Suite 2000
San Francisco, CA 94104

Mr. Thomas Elliot Gaiser
Office of the Attorney General of Ohio
30 E. Broad Street
17th Floor
Columbus, OH 43215

Mr. Oliver B. Hall
Center for Competitive Democracy
2515 Cliffbourne Place, N.W.
Washington, DC 20009

Ms. Naomi Igra
Sidley Austin
555 California Street, Suite 2000
San Francisco, CA 94104

Ms. Alexandra R. Lichtenstein
Institute for Constitutional Advocacy and Protection
600 New Jersey Avenue, N.W.
Washington, DC 20001

Mr. Tobias S. Loss-Eaton
Sidley Austin, 1501 K Street, N.W., Suite 600
Washington, DC 20005

Mr. William Powell
600 New Jersey Avenue, N.W.
Washington, DC 20001

Katie Rose Talley
Office of the Attorney General of Ohio
30 E. Broad Street, 17th Floor
Columbus, OH 43215

     Re: Case No. 24-3354, *Cynthia Brown, et al v. David Yost*
       Originating Case No. : 2:24-cv-01401

Dear Counsel,

  The court today announced its decision in the above-styled case.

  Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

       Yours very truly,

       Kelly L. Stephens, Clerk

       Cathryn Lovely
       Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CYNTHIA BROWN; CARLOS BUFORD; JENNY SUE ROWE,

*Plaintiffs-Appellants*,

*v.*

DAVID YOST, in his official capacity as Ohio Attorney General,

*Defendant-Appellee*.

No. 24-3354

─────────────

On Petition for Rehearing En Banc

United States District Court for the Southern District of Ohio at Columbus.
No. 2:24-cv-01401—James L. Graham, District Judge.

Argued En Banc: October 30, 2024

Decided and Filed: November 21, 2024

Before: SUTTON, Chief Judge; MOORE, CLAY, GRIFFIN, KETHLEDGE, STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, MURPHY, DAVIS, MATHIS, BLOOMEKATZ, and RITZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED EN BANC:** Kelsi Brown Corkran, INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION, Washington, D.C., for Appellants. T. Elliot Gaiser, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON SUPPLMENTAL BRIEF:** Kelsi Brown Corkran, Elizabeth R. Cruikshank, Alexandra Lichtenstein, William Powell, INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION, Washington, D.C., Mark R. Brown, CAPITAL UNIVERSITY, Columbus, Ohio, Oliver Hall, CENTER FOR COMPETITIVE DEMOCRACY, Washington, D.C., for Appellants. T. Elliot Gaiser, Katie Rose Talley, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON AMICUS BRIEF:** Tobias S. Loss-Eaton, Naomi Igra, Stephen Chang, Madison Ferraro, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Curiae.

The court delivered a PER CURIAM opinion. THAPAR, J. (pp. 8–23), delivered a separate concurring opinion. MOORE, J. (pp. 24–36), delivered a separate dissenting opinion, in which CLAY, STRANCH, and DAVIS, JJ., concurred, and KETHLEDGE and RITZ, JJ.,

concurred in Part II.  KETHLEDGE, J. (pp. 37–38), also delivered a separate dissenting opinion, in which MOORE, CLAY, STRANCH, DAVIS, and RITZ, JJ., concurred.

————————————

## OPINION

————————————

PER CURIAM.  At issue in this case is whether a request for a preliminary injunction focused on the 2024 election—arising from a challenge to Ohio's process for placing constitutional initiatives on the ballot—is moot.  It is.  The targeted election has come and gone, making this request for preliminary relief moot.

Since 1912, Ohio has allowed its citizens to amend the Ohio Constitution through ballot initiatives.  Ohio law requires proponents of initiatives to satisfy several requirements before their proposed constitutional amendment appears on the ballot.  At the outset, the proponents must submit their proposed amendment, a summary of it, and 1,000 signatures to the Ohio Attorney General, who then must decide whether the summary is a "fair and truthful statement of the proposed law or constitutional amendment."  O.R.C. § 3519.01(A).  If the Attorney General rejects the summary, the proponent may seek review in the Ohio Supreme Court.  *Id.* § 3519.01(C).  Once the proponent obtains approval of the summary, the Ballot Board must examine the initiative to ensure that it does not violate Ohio's single-subject requirement.  *Id.* § 3505.062(A).  With the Board's approval in hand, the proponent of the initiative may start the process of presenting the proposal and summary to Ohio citizens to obtain the roughly 400,000 signatures needed to put the amendment on the ballot.  Ohio Const. art. II, §§ 1a, 1g; O.R.C. § 3519.05(A).  Signatures are due to the Secretary of State at least 125 days before election day, which was July 3, 2024 for the last election cycle.  Ohio Const. art. II, § 1a; O.R.C. § 3519.16(B).  If the Secretary approves the signatures, the Ballot Board prescribes and certifies to the Secretary the language for the proposed amendment.  Ohio Const. art. II, §§ 1e, 1g; O.R.C. § 3505.062(D).  Proponents then prepare arguments or explanations in favor of their proposal, and the General Assembly or Governor names individuals to prepare arguments or explanations against.  Ohio Const. art. II, § 1g; O.R.C. § 3519.03(A).  Once these requirements are met, the amendment, as written by the Ballot Board,

is placed on the ballot for the next general or regular election.  Ohio Const. art. II, §§ 1a, 1g; O.R.C. § 3519.16.

This appeal arises from a ballot proposal initiated by Cynthia Brown.  In February 2023, she sought to amend the Ohio Constitution to eliminate governmental immunities or defenses in certain state-law causes of action.  That month, she submitted her proposed amendment and summary to the Attorney General.  He rejected the summary as not "fair and truthful."  In total, she has tried and failed eight times to obtain his approval.  After the Attorney General rejected her proposed summary in March 2024, Brown sought mandamus relief in the Ohio Supreme Court. With less than four months left before the July 3rd deadline to collect signatures to place her amendment on the ballot for the November 2024 election, Brown moved for expedited review. The state court declined to expedite the case, and Brown voluntarily dismissed the action.  *See* O.R.C. § 3519.01(A), (C); *State ex rel. Brown v. Yost*, 234 N.E.3d 472 (Ohio 2024) (unpublished table decision).

Brown turned to federal court for relief.  She sued the Attorney General in district court, alleging that Ohio's initiative procedures violate the First Amendment facially and as applied.  Her facial challenge complains that "Ohio's delegation to Defendant of the authority to reject summaries of proposed constitutional amendments pursuant to O.R.C. § 3519.01(A) coupled with its failure to provide for immediate judicial review and resolution in the Ohio Supreme Court under O.R.C. § 3519.01(C)" violates "the First Amendment" in all of its applications.  R.1 at 10–11 ¶ 44. Her as-applied challenge complains that the Ohio Supreme Court's "refus[al] to expedite review" and the Attorney General's "formal[] object[ion]" to it violate her free-speech rights.  R.1 at 11 ¶¶ 54–55.  She asked the district court to declare § 3519.01(A) and (C) unconstitutional and to enjoin the Attorney General from reviewing summaries without the option of expedited judicial review.

On March 27, 2024, with the upcoming November 5th election looming, Brown moved for temporary relief in the district court.  She sought to preliminarily enjoin the Attorney General "to certify Plaintiffs' summary to Ohio's Ballot Board" because "[t]he November 2024 election is closely approaching and injunctive relief is needed to ensure the initiative has a fair chance of being included on the ballot."  R.2 at 19–20.  The district court denied her motion, and she

No. 24-3354                                *Brown et al. v. Yost*                                Page 4

appealed.  A divided panel of this court granted the preliminary injunction, reasoning (among other things) that § 3519.01(A) and (C) likely impose a severe burden on Brown's "ability to advocate for [her] initiative" under the *Anderson-Burdick* line of cases and the Attorney General is likely to fail strict-scrutiny review.  *Brown v. Yost*, 103 F.4th 420, 440–43 (6th Cir. 2024).  The Attorney General petitioned for rehearing en banc.  The full court granted the petition and vacated the panel opinion.  104 F.4th 621 (6th Cir. 2024).  Neither party moved to expedite the briefing, the oral argument, or the resolution of the case before the full court.

At this point, the November 5, 2024 election has ended, which prompts this threshold question:  Is Brown's request for a preliminary injunction moot?

Article III of the United States Constitution extends the "judicial Power" only to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  A claimant must meet this "cradle-to-grave requirement" from the outset of a case to its conclusion.  *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011).  An appeal becomes moot if intervening events occur that make it "impossible" for the relevant federal court to grant any "effectual relief."  *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted).

In gauging the potential mootness of an appeal, we must focus on the request for relief in front of us.  That explains why a preliminary injunction may become moot on appeal even as the underlying controversy and the request for a permanent injunction remain live.  *Ohio v. EPA*, 969 F.3d 306, 309 (6th Cir. 2020).  To that end, we have consistently distinguished "between mootness as to a preliminary-injunction appeal and mootness as to the case as a whole."  *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc) (quoting *Ohio*, 969 F.3d at 309).  So has the U.S. Supreme Court:  "Because the only issue presently before us—the correctness of the decision to grant a preliminary injunction—is moot, . . . the case must be remanded to the District Court for trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981).

Brown's appeal from the denial of a preliminary injunction is moot.  Just as a claimant is the master of her complaint, Brown is the master of her requests for interim relief—whether for a preliminary injunction or a temporary restraining order.  In this instance, Brown unmistakably trained her request for immediate relief on the upcoming election scheduled for November 5, 2024.

No. 24-3354                          *Brown et al. v. Yost*                          Page 5

She sought a preliminary injunction requiring Yost to certify her March summary because "[t]he November 2024 election is closely approaching and injunctive relief is needed to ensure the initiative has a fair chance of being included" on that ballot. R.2 at 19; *see also* R.2-1 at 1. Throughout her motion for "preliminary" relief, she pointed to the November 2024 election. She explained to the district court that the "November 2024 election is closely approaching," R.2 at 19, that she has "less than four months to collect the 400,000-plus signatures they must submit by July [3], 2024," R.2 at 3, that "Ohio's ballot clock is ticking," R.2 at 19, and that "[t]ime is of the essence," R.2 at 3. Removing any doubt about the relief she sought in the preliminary injunction, Brown gave the proposed amendment an effective date of "January 1, 2025," after it "appear[ed] on the November 2024 ballot." Brown Supp. Br. 4; *see also* R.1 (Exhibit 3) at 5. Nowhere in these requests for immediate relief does she say that she would submit her March summary and amendment for some future election. Even Brown acknowledges on appeal the limited nature of the relief she sought: "an order permitting [her] to proceed with petition circulation in time for [her] proposed amendment . . . to be placed on the ballot for the November 2024 election." Brown Supp. Br. 2.

Now that the November 2024 election is over, her request for relief, like many a 2024 election yard sign, has become stale. Ordering Yost to certify that summary now will not give Brown the relief she seeks because the window to appear on the 2024 ballot has closed. Without power to rewind the clock, we cannot give Brown the relief she sought in her preliminary injunction. Given the "nature of the relief sought," the matter is "moot because the . . . election is over." *Brockington v. Rhodes*, 396 U.S. 41, 43 (1969) (per curiam).

We appreciate that the *underlying lawsuit* is not moot. Her request for permanent injunctive relief is not limited to 2024. R.1 at 12. Hence the passing of the November 2024 election does not undercut the live nature of the dispute pending in the district court. But it does mean that Brown has passed the use-by date of her interim request for relief. *See Ohio*, 969 F.3d at 308–10; *Resurrection Sch.*, 35 F.4th at 528.

All of this explains why it is "impossible" for us to grant any "effectual relief" to Brown at this point, *Church of Scientology*, 506 U.S. at 12, and why Brown does not have a "concrete interest, however small," in obtaining relief on her preliminary injunction, *Chafin v. Chafin*,

568 U.S. 165, 172 (2013) (citation omitted).  Sure, a ruling in her favor in this case might advance the general cause of her underlying non-moot lawsuit by giving her a "head start" on collecting signatures for November 2025.  Yost Supp. Br. 4.  But it would not advance the specific cause of the request for "relief" before us—an order seeking relief with respect to a summary meant by its terms only for the 2024 election.  In an "adversarial system of adjudication, we follow the principle of party presentation."  *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).  Only in her request for a permanent injunction does Brown seek relief for elections after 2024.  Parties are limited to the preliminary relief they requested.  *See Resurrection Sch.*, 35 F.4th at 530.  It thus makes no difference that an approved ballot summary may be used in future elections.  In this instance, Brown's proposal was limited to the November 2024 election and came with a now-inaccurate effective date of "January 1, 2025."

Any other approach runs the risk of collapsing the distinction between preliminary and permanent injunctions.  It is the rare grant of preliminary relief for a claimant that would not aid her underlying request for permanent relief.  We know of no federal court, and the parties at any rate have not identified one, that permits the non-moot nature of an underlying request for permanent relief to save a moot request for preliminary relief.  Much as we should squint carefully at any request for preliminary relief to determine whether it could benefit the claimant, we cannot close our eyes when the window for relief actually sought by the claimant has ended.

It's true that a federal court has a "virtually unflagging obligation" to exercise the jurisdiction given it.  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).  But this principle asks a question; it does not answer it.  It's just as accurate to say that a federal court has an "unflagging obligation" to determine whether it has Article III jurisdiction over a dispute—save that this imperative is categorically unflagging, not "virtually" unflagging.

The "narrow" exception for disputes that are "capable of repetition, yet evading review" does not spare this appeal.  *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975).  Rather than evade review, Brown's First Amendment challenges in the underlying lawsuit are on track to receive it before the next general election:  November 2025.  On remand, Brown remains free to seek expedited resolution of the permanent injunction request.  Nothing prevents either party from seeking expedited review of an adverse decision.  And nothing prevents either party from seeking

No. 24-3354                     *Brown et al. v. Yost*                     Page 7

expedited en banc review. All of this by the way allows the district court to consider several other intervening developments: Brown's subsequent submission of a new summary intended for Ohio's November 2025 election, the Attorney General's rejection of it, a recent decision by the Ohio Supreme Court that undermines one of the Attorney General's prior rejections, *State ex rel. Dudley v. Yost*, -- N.E.3d -- , 2024 WL 4610503 (Ohio 2024) (per curiam), a recent order by the Ohio Supreme Court requiring a response by the Attorney General, and the developing nature of both parties' theories with respect to the nature of the free-speech rights at issue. Because these issues all are "primarily if not entirely legal," the federal courts stand ready to resolve them quickly. *Ohio*, 969 F.3d at 309.

All of this may explain the ambivalence of the party with her free-speech rights at stake—Brown—in responding to our request for supplemental briefing about mootness. While she maintains that the appeal remains live, she concedes that her requested relief "became outdated" after the "July deadline for the November 2024 election passed," and "do[es] not object to dismissal" as it would allow her to "seek relief tailored to [her] current efforts to place the[] proposed amendment on the ballot in 2025." Brown Supp. Br. 1, 5. We, too, agree that there is ample time to ensure that her First Amendment rights are aired in time for the November 2025 election, and we stand ready to ensure that happens.

Because Brown did not have an opportunity to obtain appellate review of the district court's decision denying her request for preliminary relief, we vacate that decision. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–41 (1950).

For these reasons, we dismiss the appeal as moot.

No. 24-3354                    *Brown et al. v. Yost*                    Page 8

———————————

**CONCURRENCE**

———————————

THAPAR, Circuit Judge, concurring in the denial of the preliminary injunction. Plaintiffs sought a preliminary injunction to force the Ohio Attorney General to certify their ballot initiative. Their motion has two basic problems. First, to the extent they are seeking relief for the November 2024 election, I agree with my colleagues that their motion is moot. Second, even if they are seeking prospective relief for future elections, their motion fails because they have not shown that they are likely to succeed on the merits.

I.

Whether plaintiffs' motion for a preliminary injunction is now moot depends on what relief they sought in the district court. There, plaintiffs asked for a preliminary injunction directing the Attorney General to certify the March 2024 summary of their amendment proposal as fair and truthful. They tied that March certification request to their desire to get on the November 2024 election ballot. Plaintiffs added that time was "of the essence" so that they could get on the ballot come November 2024. R. 2, Pg. ID 45. In addition, plaintiffs' March 2024 summary and proposed amendment text listed the effective date of the amendment as January 1, 2025. That effective date assumed that the proposed amendment would be on the November 2024 ballot. Viewed in context, then, it seems that plaintiffs' request was geared towards circulating their proposal in time for the November 2024 election. But that election is now a thing of the past. So as the majority opinion thoughtfully lays out, their motion could be moot.

But as both parties point out, the Attorney General's summary certifications roll over from election to election and have no expiration date. *See* Ohio Const. art. II, § 1a; Ohio Rev. Code § 3519.01. And as the Attorney General readily admits, once plaintiffs get the certification, they can start collecting signatures for 2025 or a future election. So, it seems that our ordering the Attorney General to certify the March 2024 summary may give plaintiffs some "effectual relief," which means their motion wouldn't be moot. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted).

No. 24-3354                          *Brown et al. v. Yost*                          Page 9

In short, the mootness question is thorny. But even if plaintiffs' request isn't moot, they still wouldn't be entitled to a preliminary injunction. That's because they can't show that they would be likely to succeed on the merits of their First Amendment claim.

II.

As plaintiffs admitted at argument, their theory of First Amendment injury has shifted throughout this litigation. When plaintiffs first filed their complaint and motion for preliminary injunctive relief, they repeatedly stressed the lack of expedited state-court review of the Attorney General's summary certification decisions. They cited this delay as a key reason why their First Amendment rights were being violated. Before the en banc court, plaintiffs did refer to that lack of timely judicial review as a problem. But that issue took a backseat to a different First Amendment argument—that the Attorney General is exercising content-based, editorial control over plaintiffs' core political speech. Plaintiffs pressed this theory at oral argument. So, when we compare plaintiffs' original complaint and motion for preliminary injunctive relief with their appellate stage briefing and oral argument, their First Amendment arguments have not been consistent. That's reason enough to deny them a preliminary injunction.

In addition, there is no longer any exigency. Plaintiffs can go back to the district court and seek an injunction for the 2025 election. When they do so, they can more precisely articulate the alleged First Amendment issue. The district court and this court can then rule on that motion with the benefit of fuller, more consistent briefing.

And even if we overlooked plaintiffs' shifting arguments and assessed only the strongest ones, they still are unlikely to succeed.

Start with the basics. The First Amendment protects Americans' right to speak to one another about matters of public concern. But the First Amendment doesn't give anyone a right to have their speech carry the force of law.

Therefore, when we assess First Amendment challenges to states' regulations of initiative processes, we must distinguish between two types of regulations: (1) regulations of citizens' ability to *speak* to one another as part of that process, and (2) regulations of citizens' ability to

No. 24-3354                          *Brown et al. v. Yost*                          Page 10

*make law* as part of that process.  The former likely poses a serious First Amendment problem and would be subject to strict scrutiny.  The latter likely does not even implicate the First Amendment and would be subject to no First Amendment scrutiny at all.

A.

The First Amendment protects Americans' right to persuade.  If a state opts to create a ballot initiative process, the First Amendment limits the extent to which the state can regulate "advocacy itself" that takes place within the initiative process.  *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc) (McConnell, J.).  States don't have free rein to dictate who can speak or how they speak when citizens try to persuade one another of an initiative's merits.  *Id.*  When it comes to "interactive communication concerning political change," First Amendment protections are at their "zenith."  *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186–87 (1999) (citation omitted).  So, a state's efforts to limit private expression by those trying to convince others to vote a certain way likely raises serious First Amendment problems— whether that expression takes the form of one-on-one conversations with members of the public or the mass distribution of political handbills.  *Meyer v. Grant* proves this point.  There, the Supreme Court invalidated a Colorado law that banned citizens from paying others to circulate petitions to amend the state constitution.  486 U.S. 414, 416 (1988).  The Court reasoned that the First Amendment protects citizens' "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."  *Id.* at 424.  Therefore, Colorado's paid circulation ban not only implicated the First Amendment; it triggered strict scrutiny because it directly regulated core political speech.  *Id.* at 420–21.

But the First Amendment doesn't give Americans a right to legislate.  Again, start with the basics.  Governments can restrict legislators' speech during the lawmaking process and can limit the laws they pass.  For example, to this day, states like Ohio require their legislators to "confine" their floor speeches to the "question under debate."  *See, e.g.*, Ohio House of Representatives Rule 48(a); Michigan House of Representatives Standing Rule 28; Tennessee House of Representatives Rule 18.  Such content-based restrictions on legislators' speech within the lawmaking process aren't new.  Colonial assemblies had rules barring "profanity" and "unseemly, unnecessary, and tedious debate."  Keith E. Hamm & Peverill Squire, *101 Chambers: Congress, State Legislatures,*

*and the Future of Legislative Studies* 18 (2005) (citation omitted).  That's unsurprising:  The First Amendment does not "confer[] a right to use governmental mechanics to convey a message."  *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011).  Similarly, governments can restrict what sorts of laws legislators may enact.  Federal and state constitutions say legislators can't pass some laws—like giving out noble titles or stripping jury trial rights.  *See, e.g.*, U.S. Const. art. I, § 9; Ohio Const. art. I, § 5.  Likewise, governors can veto laws legislatures passed.  Neither restrains legislators' speech—just the legal effects of their conduct.

The same logic applies to the petition process.  Governments can restrict what citizens can propose through the official initiative process.  When initiative proponents submit their proposals for certification, they're like the legislators in the state house who are subject to no-swearing and "question under debate" rules.  So too can governments restrain what sorts of petitions can ultimately become law.  If an initiative garners enough signatures and otherwise complies with applicable rules, it becomes the law.  So, when the government regulates the content of initiative petitions and their summaries, it isn't regulating private speech based on content—it's regulating what sorts of laws citizens can enact.

Therefore, a state likely doesn't have to worry about the First Amendment at all—let alone satisfy strict scrutiny—when it regulates an initiative petition's content or its summary's content.  *See Walker*, 450 F.3d at 1099–1100.

## B.

Indeed, when it comes to initiative processes, states have long been free to determine that a wide array of subjects are off limits.  Once a state makes that determination, it can impose various content-based checks on initiative proposals and their summaries either before or after signature collection.  In short, Ohio isn't in a league of its own.

Consider a few examples.  In Montana, much like in Ohio, the Attorney General reviews proposed initiatives "for legal sufficiency."  Mont. Code Ann. § 13-27-226(1).  Whether a proposal is legally sufficient hinges in part on its content—including the accuracy of the proposal's summary, which must be "true and impartial."  *Id.* § 13-27-212(1).  If the Attorney General deems the proposal legally insufficient, the proposal can't reach the ballot.  *Id.* § 13-27-218(8)(a).  And

No. 24-3354                    *Brown et al. v. Yost*                    Page 12

just like in Ohio, Montanans can challenge the Attorney General's legal sufficiency determination in court. *Id.* § 13-27-605.

Maine law includes similar provisions. In that state, citizens can propose legislation for the legislature to enact. Me. Const. art. IV, Pt. 3, § 18. To do so, they first need to file their proposed law's text and summary with the Secretary of State. Me. Rev. Stat. Ann. tit. 21-A, § 901. The Secretary can reject the citizens' proposal if he concludes that its titles or headnotes don't "objectively reflect" the proposal's "content." *Id.* § 901(3-A)(B)(2). Much like in Ohio and Montana, Maine voters named in the application can challenge the Secretary's decision in state court. *Id.* § 901(7).

Other states restrict citizens' ability to collect signatures and propose amendments based on the content of their proposed amendments. In Massachusetts, the people have "reserve[d]" to themselves the power to initiate amendments to their state constitution. Mass. Const. amend. art. 48, Pt. 1, Def. But various content-based restrictions limit their ability to propose initiatives: They can't propose amendments relating to religion, abolishing courts, or infringing on the jury trial right, just to name a few. *Id.* Init., Pt. 2, § 2. After initiative proponents get an initial ten signatures, the Attorney General ensures that the proposed amendment doesn't touch on one of those off-limits buckets of content. *Id.* Pt. 2, § 3. Once the Attorney General has made that determination and the proponents have filed their proposal with the Secretary of State, they collect more signatures to get their proposal on the ballot. *Id.* Pt. 4, § 2; *see also Herrmann v. Att'y Gen.*, 208 N.E.3d 727, 732 (Mass. 2023) (describing this process). After the proponents complete these steps, their proposal appears on the ballot only if one-quarter of state legislators approve it in successive legislative sessions. Mass. Const. amend. art. 48, Init., Pt. 4, §§ 4–5. Massachusetts' many restrictions on the content of initiative petitions—and its empowering of its Attorney General to enforce those restrictions—have withstood First Amendment challenges. *See Wirzburger v. Galvin*, 412 F.3d 271, 275–80 (1st Cir. 2005).

Massachusetts' content-based restrictions on its citizens' lawmaking powers aren't unique. Missouri's state constitution prohibits citizens from using the initiative process "for the appropriation of money other than of new revenues created and provided for thereby." Mo. Const.

No. 24-3354                          *Brown et al. v. Yost*                          Page 13

art. III, § 51.  And when an initiative petition is submitted to the Secretary of State, he must first ensure that it substantively complies with the Missouri constitution.  Mo. Ann. Stat. § 116.120(1).

In Wyoming, citizens can use the initiative process to pass legislation, but they can't use it "to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, enact local or special legislation, or enact that prohibited by the constitution for enactment by the legislature."  Wyo. Const. art. III, § 52(g).  And only after the Secretary of State has certified that the petition is "in proper form" can proponents circulate it to their fellow citizens to obtain the required number of signatures.  *Id.* art. III, § 52(b)–(c).

In other states, initiative proponents must include certain disclaimers and other pieces of information on the forms that they ask their fellow citizens to sign.  For example, in Utah, if an initiative proposes a tax increase, proponents must identify the current tax rate and specify by how much they hope to raise it.  Utah Code Ann. § 20A-7-203(2)(b).

The fact that some of these state procedures provide for content-based review of initiative proposals *after* signature collection, while Ohio's provides for that review *before* the vast bulk of signature collection, is irrelevant from the perspective of the First Amendment.  Whatever the timing of the content-based review, the state is limiting which signed proposals can be given legally operative effect.  Only proposals that clear the state's gatekeeping hurdle can become law.

To sum up:  States enjoy broad leeway to regulate the content of initiative proposals and their summaries.  Why?  States can prohibit citizens from passing laws on some topics and can stop initiatives purporting to pass such laws.  *See, e.g.*, Mass. Const. 48, Init., Pt. 2, § 2; *Wirzburger*, 412 F.3d at 271, 274; *Marijuana Pol'y Project v. United States*, 304 F.3d 82 (D.C. Cir. 2002).  States can also provide that amendments with inaccurate summaries can't become law. *See, e.g.*, Mont. Code Ann. § 13-27-212(1).  Neither procedure restricts citizens' ability to speak— only their ability to "wield a legislative power."  *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 530–31 (9th Cir. 2015) (en banc) (emphasis omitted).

No. 24-3354                         *Brown et al. v. Yost*                         Page 14

### C.

Ohio's law regulates citizens' power to make law, not their right to speak. The fair-and-truthful certification provision lays out a threshold requirement that Ohioans must meet before they advocate their position to would-be signatories however they see fit. After citizens obtain an initial 1,000 signatures, the summary certification requirement poses a gatekeeping hurdle that they must clear before they continue to speak as part of the initiative process. The law doesn't regulate speech that takes place within the initiative circulation process itself, as the Colorado law at issue in *Meyer* did. Recall that in that case, Colorado had prevented citizens from using particular speakers—paid circulators—to get their pro-reform message out. By contrast, Ohio doesn't say who can speak or how they can speak when they engage with their fellow citizens. *See Walker*, 450 F.3d at 1099.

For example, Ohio cannot bar someone from engaging in "unfair" or "untruthful" conversations when they are seeking signatures on the campaign trail. Indeed, proponents can say whatever they please to get their message out. And even if the Ohio Attorney General declines to certify plaintiffs' summary, plaintiffs remain free to persuade their fellow Ohioans of their cause. They also can circulate a petition to this effect, collect signatures, and call for constitutional change. But when those same proponents show up and ask Ohio to give their proposal legally operative effect, Ohio can restrict the language of the law itself—or in this case the summary. By refusing to certify plaintiffs' summary, the Attorney General merely prevents that sort of speech from having legal effect under state law. Such a process has friends in other states, and it doesn't have an enemy in the First Amendment.

### D.

If one were to compare Ohio's law with the examples from other states like Montana and Massachusetts, one might still fault Ohio's fair-and-truthful certification provision as follows: It's one thing for a state to prohibit citizens from making law on certain topics, but it's quite another for the state to veto inaccurate summaries of citizen petitions when the initiative's topic is fair game under state law. But that's a distinction without a constitutional difference. They're both content-based restrictions on the initiative process. The state may be concerned with different

No. 24-3354 *Brown et al. v. Yost* Page 15

sorts of content of citizen-initiated laws—maybe the proposal deals with a particular policy area, maybe the summary inaccurately reflects the proposal. It doesn't matter. The point is that the state is regulating what sorts of laws its citizens can enact rather than directly regulating their expression.

Similarly, a First Amendment challenge to Ohio's law for vesting the Attorney General with too much discretion misses the mark. At first blush, this sort of argument has force since the last thing the First Amendment allows for are prior restraints or vague prohibitions. But again, states can restrict what sorts of laws and amendments their citizens can pass by way of initiatives. And the First Amendment doesn't stop a state from delegating discretion to an executive official like the state Attorney General to limit or prohibit citizen lawmaking. When Attorney General Yost enforces the fair-and-truthful certification provision, he isn't directly regulating speech; he's restricting what sorts of citizen initiative proposals can become law. *Schmitt v. LaRose*, 933 F.3d 628, 638 (6th Cir. 2019). At any rate, his exercise of discretion isn't unreviewable: Plaintiffs can turn to the state courts for legal relief if they think the Attorney General is acting outside the bounds of his statutory authority. *See* Ohio Rev. Code § 3519.01(C). In fact, plaintiffs are doing precisely that right now. *See* Doc. 63, Pg. 2.

E.

Because Ohio's law doesn't directly regulate political speech made within the initiative process, it certainly shouldn't be subject to strict scrutiny. But should it be subject to *any* level of First Amendment scrutiny? No.

Different courts have come out differently on the question of what tier of scrutiny—if any—should apply to content-based regulations of initiative processes.

When confronted with a First Amendment challenge like this one, the First Circuit applied intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968). *Wirzburger*, 412 F.3d at 275. Intermediate scrutiny applies when a law regulates conduct that contains both speech and nonspeech elements. *O'Brien*, 391 U.S. at 376–77. In *Wirzburger*, plaintiffs argued that the Massachusetts constitutional provisions excluding citizen initiatives on certain topics like religion and jury trials set forth impermissible content-based restrictions on their core political speech. The

No. 24-3354                          *Brown et al. v. Yost*                          Page 16

First Circuit rejected their argument.  It reasoned that the "difficulty" with plaintiffs' argument was "that a state initiative procedure, although it may involve speech, is also a procedure for generating law, and is thus a process that the state has an interest in regulating, apart from any regulation of the speech involved in the initiative process."  *Wirzburger*, 412 F.3d at 275. Massachusetts' interest in controlling its lawmaking process wasn't related to the expression that takes place as part of the initiative process.  *Id.* at 278.  Still, the court concluded that the state's content-based restraints on its initiative process restricted speech—namely, one-on-one communications between proponents and would-be signatories.  *Id.* at 279.  As a result, the court subjected Massachusetts' exclusions of certain topics from the initiative process to *O'Brien*'s intermediate scrutiny standard.  *Id.*  The First Circuit determined that those exclusions cleared *O'Brien*'s bar.  *Id.*

By contrast, the en banc Tenth Circuit concluded that content-based restraints on citizens' initiative lawmaking powers shouldn't be subject to any First Amendment scrutiny, including *O'Brien*'s standard.  *See Walker*, 450 F.3d at 1085, 1101–04.  In *Walker*, the Tenth Circuit affirmed the dismissal of plaintiffs' challenge to Utah's supermajority voting requirements for initiatives relating to wildlife management.  *Id.* at 1085.  Writing for the majority, then-Judge McConnell rejected *Wirzburger*'s reliance on *O'Brien*.  He explained that *O'Brien*'s intermediate scrutiny standard doesn't apply "to structural principles of government making some outcomes difficult or impossible to achieve."  *Id.* at 1102.  It's one thing to regulate expressive conduct; it's another thing to make that expressive conduct less likely to result in a new law being passed.  *Id.*

The Tenth Circuit has the better of the argument.  Ohio's law directly impacts only the legal effects of the speech that initiative proponents make as part of the circulation process.  As a panel of this court observed, "Ohio's ballot-initiative laws . . . do not directly restrict core expressive conduct; rather, the laws regulate the process by which initiative legislation is put before the electorate, which has, at most, a second-order effect on protected speech."  *Schmitt*, 933 F.3d at 638.  Again, Ohio isn't barring initiative proponents from speaking or collecting signatures. It's merely imposing a threshold requirement that proponents must satisfy if they want their speech and signature collection to have legally operative effect.  Understood in this light, Ohio's law isn't

regulating the expressive component of the initiative process at all.  So, it wouldn't make sense to subject it to First Amendment scrutiny.

And to echo then-Judge McConnell's logic in *Walker*:  Ohio's fair-and-truthful requirement doesn't burden speech just because it impedes state constitutional reform.  450 F.3d at 1102.  Yes, Ohio's law may make it less likely that Ohioans will achieve constitutional reform, but "it does not follow that all such limitations are challengeable under the First Amendment."  *Id.*

Also, unelected federal judges like us have additional reason to pause before subjecting states' regulations of their own initiative procedures to intermediate scrutiny.  By applying *O'Brien*, we necessarily must pass on whether the state's interest is "substantial."  That's worrisome, because it entails "an assessment of the virtues and vices of the particular initiatives that are affected by the limitation."  *Id.* at 1103; *cf. Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 117 F.4th 389, 400 (6th Cir. 2024) (Thapar, J., concurring) (critiquing the tiers of scrutiny for "giving judges free rein to weigh a statute's means and ends").  Unless the First Amendment demands otherwise, it's up to the people and elected representatives of each state, not us unelected federal judges, to determine how to best structure their legislative processes.

Speaking of our limited role as a federal court, consider what would follow if we were to subject Ohio's law or the Attorney General's enforcement to First Amendment scrutiny and then find a First Amendment violation.

If we were to conclude that the law itself was unconstitutional, we'd be telling Ohio that its selected means of regulating what amendments its citizens can enact via initiatives are impermissible—even though the Constitution doesn't require Ohio to set up an initiative process at all.  *Thompson v. DeWine*, 976 F.3d 610, 615 (6th Cir. 2020) (per curiam).  We'd also throw the constitutionality of a wide array of analogous state provisions into doubt.  If Ohio's fair-and-truthful certification provision doesn't pass constitutional muster, presumably the content-based limits on initiatives and summaries imposed by states like Massachusetts, Maine, and Montana wouldn't, either.

And what if we held that only the Attorney General's enforcement of the provision violated the First Amendment?  Could we somehow claim that the Attorney General incorrectly interpreted

state law and that error somehow offended the First Amendment?  On what basis would we conclude as much?

The Constitution doesn't give us judges the power to dictate the ins and outs of Ohio's initiative process.  States have "important regulatory interests in combating fraud" in their elections and initiative processes. *Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring in the grant of stay).  And they "retain 'considerable leeway to protect the integrity and reliability of the initiative process.'"  *Id.* at 2616 (quoting *Buckley*, 525 U.S. at 191).  In enacting the fair-and-truthful certification provision, Ohio stayed within the bounds of its discretion.  If we concluded otherwise, we'd exceed ours.

F.

Finally, public forum precedents don't bear on Ohio's fair-and-truthful certification provision.  Public forums are dedicated to fostering speech and debate.  *See Marijuana Pol'y Project*, 304 F.3d at 86 (collecting cases).  Ballots are geared towards structuring democratic elections, not fostering debate.  *Cf. Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997).  The same goes for ballot initiative processes:  They may "stimulate[] First Amendment-protected debate and discussion," but the "legislative act" of voting in the initiative process isn't a public forum.  *Marijuana Pol'y Project*, 304 F.3d at 87.

III.

The principal dissent challenges (1) my reliance on the distinction between regulations of speech and regulations of citizen lawmaking and (2) my characterization of Ohio's law as a regulation of citizen lawmaking.  I address each concern in turn.

A.

The principal dissent writes that, in the ballot initiative context, Supreme Court precedent prevents us from distinguishing regulations of citizens' ability to make law from regulations of citizens' ability to speak.  The dissent argues:  "The Supreme Court has never cordoned off the ballot-initiative process from First Amendment scrutiny.  To the contrary, the Supreme Court has indicated that regulations of the ballot-initiative process should be analyzed in the same terms as

No. 24-3354                           *Brown et al. v. Yost*                           Page 19

other election-related regulations." Moore Dissenting Op. 32. This statement implies that every regulation of state ballot initiative processes should be subject to First Amendment scrutiny. The Supreme Court has never endorsed this sweeping proposition.

Consider the case that the dissent cites in support of its argument: *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999). That case doesn't support the proposition that a state's regulation of its ballot initiative process automatically triggers some form of First Amendment scrutiny. There, the Court invalidated various Colorado laws regulating speech made within its initiative process. For example, one of those laws required petition circulators to be registered voters. The Court reasoned that, much like the paid circulator ban set aside in *Meyer*, this provision restricted proponents' ability to spread their message and decreased the size of their audience. *Id.* at 194–95. In other words, the regulation burdened political expression. *Id.* at 195. Therefore, the Court subjected the law to First Amendment scrutiny. *Id.* at 197. The fact that the state was regulating speech, not that it was regulating in the ballot initiative context, is what triggered First Amendment scrutiny.

*Buckley* thus stands for the unremarkable proposition that regulations of political expression trigger First Amendment scrutiny. Ohio's law, by contrast, does not regulate political expression. Plaintiffs here remain free to make the same amount of political expression, using the same methods, as they would be able to make without the certification provision. Plaintiffs can circulate their petition and their summary to whomever they please. The only difference is that Ohio has refused to endow that expression with legislative significance. Nothing in *Buckley* suggests that the First Amendment is implicated by a state's regulation of the processes by which citizens may engage in lawmaking.

To be sure, the *Buckley* Court cited other First Amendment cases about election regulations like *Anderson v. Celebrezze*, 460 U.S. 780 (1983). But in doing so, *Buckley* did not demand that all ballot initiative regulations be subject to First Amendment scrutiny. Rather, *Buckley* cited those cases to support the uncontroversial proposition that "no litmus-paper test" could easily resolve First Amendment challenges in the electoral context. *Buckley*, 525 U.S. at 192 (citation omitted). That's why the Court felt compelled to "detail" why, just "as in *Meyer*," the laws at issue

No. 24-3354                           *Brown et al. v. Yost*                           Page 20

"significantly inhibit[ed] communication with voters about proposed political change"—thereby triggering First Amendment scrutiny.  *Id.*

Moreover, if the principal dissent were correct that "the Supreme Court has indicated that regulations of the ballot-initiative process should be analyzed in the same terms as other election-related regulations," then at least four sitting Supreme Court Justices are curiously unaware of their own Court's precedent.  In *Little v. Reclaim Idaho*, the district court had ordered Idaho to certify a citizen-initiated ballot measure, even though the initiative's proponents hadn't obtained the requisite number of signatures under state law.  140 S. Ct. 2616 (2020).  The Supreme Court stayed the district court's injunction.  Concurring in the grant of the stay, Chief Justice Roberts (joined by Justices Alito, Gorsuch, and Kavanaugh) expressed doubts that neutral, procedural ballot-initiative regulations like signature requirements implicated the First Amendment at all.  His opinion observed that states have "considerable leeway to protect the integrity and reliability of the initiative process."  *Id.* at 2616 (Roberts, C.J., concurring in the grant of stay) (quoting *Buckley*, 525 U.S. at 191).  He then emphasized that "[n]othing in the Constitution requires Idaho or any other State to provide for ballot initiatives."  *Id.* at 2617.  Only then did his opinion proceed to "assum[e]" for the sake of argument that neutral, procedural ballot initiative regulations like signature requirements might "implicate the First Amendment" at all.  *Id.*  If the principal dissent were correct, then four Justices were wrong to imply that certain ballot initiative regulations are not subject to any First Amendment scrutiny.

The principal dissent's analysis also conflicts with the en banc Tenth Circuit's decision in *Walker*.  There, the Tenth Circuit cited the relevant Supreme Court precedents like *Meyer* and *Buckley* and drew from them a common-sense rule:  "Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise."  *Walker*, 450 F.3d at 1099.

In sum, I don't read the Supreme Court to have "cordoned off the ballot-initiative process from First Amendment scrutiny."  Moore Dissenting Op. 32.  But at the same time, the Supreme Court also hasn't mandated that all ballot initiative regulations be subject to First Amendment scrutiny.  Instead, the Court has focused on whether ballot initiative regulations restrict speech.

No. 24-3354 *Brown et al. v. Yost* Page 21

Because the First Amendment concerns itself with government regulation of the freedom of speech, I propose that we do the same.

B.

Accepting for the sake of argument that regulations of the lawmaking process do not implicate the First Amendment, the principal dissent nevertheless argues that Ohio's law regulates speech. The dissent rejects my contention that Ohio's law merely regulates citizens' ability to make law.

In doing so, the dissent relies on *Doe v. Reed*, 561 U.S. 186 (2010). In that case, the Supreme Court subjected to First Amendment scrutiny a state's requirement that referendum signatories disclose their names and contact information. *Id.* at 194–95. The forced disclosure of a citizen's signature on an initiative, the court held, implicated speech. *Id.* But the state observed that it had attached legislative consequences to that speech, since each signature was a "legally operative legislative act" that increased the likelihood of the initiative's reaching the ballot. *Id.* at 195. And the state argued that, because it had attached legislative consequences to the speech, the state could insulate its regulation of that speech from First Amendment scrutiny. *Id.* The Court rejected that argument. *Id.* It reasoned that the state's "adding . . . legal effect to an expressive activity" doesn't take the expressive activity outside the protection of the First Amendment. *Id.* In other words, a state can't use a referendum or initiative process as an excuse to regulate speech free of the First Amendment's strictures.

This case isn't *Doe*—it's the inverse of *Doe*. Here, plaintiffs object to the state's *refusal* to give legal effect to their speech. They argue that the state has violated the First Amendment by refusing to attach legislative consequences to their initiative proposal. But plaintiffs have no First Amendment right to require the state to endow their speech with legal significance. Plaintiffs remain free to speak as they please; they can circulate the text of their proposal and even their preferred summary however they see fit. Yet they don't have a First Amendment right to require the state to bestow the force of law upon their arguments and ideas. *Doe* merely held that just because a state has attached legal significance to speech, that doesn't remove the speech from the First Amendment's protection. *Id.* Nowhere does *Doe* say that states are required to endow

No. 24-3354                           *Brown et al. v. Yost*                           Page 22

citizens' speech with legislative effect. That makes sense, since the First Amendment protects a right to speak—not a right to legislate.

*    *    *

When faced with First Amendment challenges, we should be wary of putting the government to an "all-or-nothing choice" that risks resulting in "less speech, not more." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998). "Nothing in the Constitution requires [Ohio] or any other State to provide for ballot initiatives." *Little*, 140 S. Ct. at 2617 (Roberts, C.J., concurring in the grant of stay). After all, initiative processes are a relatively recent phenomenon; states first implemented them at the turn of the twentieth century. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 793–94 (2015) (surveying history); *see also Comm. to Recall Dan Holladay v. Wiley*, No. 23-35107, 2024 WL 4551464, at *5–9 (9th Cir. Oct. 23, 2024) (Bumatay, J., dissenting from the denial of rehearing en banc) (same).[1] Far be it from the federal courts to make a tool of direct democracy so potent that states may be induced to remove it from citizens' toolbox of self-governance.

Luckily, the First Amendment doesn't require us to risk catalyzing such perverse consequences. States face First Amendment constraints when they directly regulate speech within the initiative process, but they don't face First Amendment scrutiny when they structure and limit what laws and amendments citizens can enact by direct democracy. Thus, I would deny plaintiffs' motion for a preliminary injunction because they haven't shown that they're likely to succeed on the merits.

Ultimately, Ohioans who are frustrated by the Attorney General's exercise of his gatekeeping authority under the fair-and-truthful certification provision must turn to state courts for legal relief. *See* Ohio Rev. Code § 3519.01(C). And if that doesn't work, they can focus their

---

[1]The one exception was the Georgia constitution of 1777. *See Comm. to Recall Dan Holladay*, 2024 WL 4551464, at *6 (Bumatay, J., dissenting from the denial of rehearing en banc). Georgia imposed high barriers—in terms of both the number of signatures required and how widely distributed throughout the state they had to be—that initiative proponents had to clear. *Id.* These onerous requirements "coexisted with a somewhat analogous protection of public discourse elsewhere in the constitution." *Id.* So, in Georgia at the founding, "the protection of public discourse was not understood to demand flexibility in ballot qualification rules." *Id.*

No. 24-3354 *Brown et al. v. Yost* Page 23

efforts on unseating him from office by speaking, writing, and persuading their fellow citizens. The First Amendment will be there to protect their efforts.

No. 24-3354                          *Brown et al. v. Yost*                          Page 24

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  Plaintiffs are proponents of "Protecting Ohioans' Constitutional Rights," a proposed state constitutional amendment that would create a private right of action without recourse to governmental immunity for state officials when they violate Ohioans' state constitutional rights.  Because Ohio Attorney General David Yost has repeatedly refused to certify a summary of their initiative for nearly two years, Plaintiffs have been unable even to begin collecting signatures in support of their amendment.  Plaintiffs have asked us for a preliminary injunction requiring Yost to certify a summary they submitted to Yost on March 5, 2024.  We can and should grant them relief so that they can exercise their First Amendment rights while this litigation proceeds.

## I. BACKGROUND

Ohio law requires citizens to take several steps before they can place a proposed constitutional amendment on the ballot.  As relevant here, petitioners must collect 1,000 supporting signatures for their proposed amendment and then submit the proposed amendment, along with a summary, to the Ohio Attorney General for review.  Ohio Rev. Code § 3519.01(A).  The Ohio Attorney General reviews that summary within ten days and determines whether "the summary is a fair and truthful statement of the proposed . . . constitutional amendment."  *Id.*  If the summary is fair and truthful, the Ohio Attorney General certifies the petition to the Ohio ballot board for approval.  *Id.*  Only after petitioners have gained these approvals can they begin collecting the approximately 400,000 signatures they need to get on the ballot.  In short:  unless the Ohio Attorney General deems the summary "fair and truthful," petitioners cannot circulate their petition.

Obtaining approval of Plaintiffs' petition summary has proven to be a Sisyphean task.  Over the past 21 months, Plaintiffs have submitted a proposed summary to Yost *seven* times; each time, Yost found a nit or two to pick.  *See* D. 44 (Pls.' En Banc Suppl. Br. at 3).  For example, Yost rejected one proposed summary in part because it was "misleading to the extent that it falsely purports to set forth an exhaustive list of potential venues" when the summary addressed only the

venue for lawsuits against one public employee but did not address venue for lawsuits against multiple public employees who do not live or work in the same county. R.1 (Compl., Ex. 2, November 17, 2023, Letter at 2) (Page ID #26). This was misleading, according to Yost, even though it was not in conflict with the proposed amendment itself. *See id.* That was not the only problem he found. Yost also identified a purportedly misleading conflict in that the proposed amendment defined the State to mean "the State of Ohio, including, but not limited to, the offices of all elected state officers and all departments and other instrumentalities of the State of Ohio," and the summary provided only that a cause of action would be available against "the State of Ohio, its officers, departments and instrumentalities," omitting specific mention of "offices of all elected state officers." *Id.* at 3 (Page ID #27). Yost added that these were "just a few examples of the summary's omissions and misstatements" but declined to give any further guidance on what (if anything) Plaintiffs could do to succeed. *Id.* at 5 (Page ID #29).

And, indeed, Yost had not yet aired all his concerns, as his response to the March 5, 2024, petition would reveal. This time, Yost took issue with the way Plaintiffs implemented his prior suggestions and, for the first time, challenged the amendment's title. R. 1 (Compl., Ex. 4, March 14, 2024, Letter at 2) (Page ID #39). He claimed that the title, which Plaintiffs included in prior submissions, was misleading because it "offers a subjective hypothesis (that eliminating such defenses will 'protect' the constitutional rights of citizens) regarding the proposed amendment in lieu of an objective description of its character and purport (that it creates a cause of action notwithstanding those defenses)." *Id.* Basically, Yost rejected the title because he did not agree that removing qualified immunity would protect citizens' constitutional rights.

No end in sight, Plaintiffs challenged Yost's rejection of the March 5, 2024 summary in the state supreme court. That too proved difficult: after Yost opposed expedited consideration, the Ohio Supreme Court refused to supply any expedited review, effectively frustrating Plaintiffs' efforts to obtain any meaningful relief before the November 2024 election. *See* D. 44 (Pls.' En Banc Suppl. Br. at 4). So, Plaintiffs turned to the federal courts, asserting that Yost's repeated refusals, coupled with a lack of timely review in state court, violated their First Amendment rights.[1]

---

[1]Meanwhile, Plaintiffs tried submitting yet another proposed amendment and summary—this one with no title at all—which Yost rejected for that reason. *See* D. 44 (Pls.' En Banc Suppl. Br. at 3). Plaintiffs challenged that

No. 24-3354                         *Brown et al. v. Yost*                         Page 26

Plaintiffs sought a preliminary injunction, which the district court denied. On appeal, a panel of this court reversed and granted preliminary relief enjoining Yost from enforcing § 3519.01 and ordering him to send Plaintiffs' proposed amendment and the most recent summary to the ballot board for the next phase of the process. *Brown v. Yost*, 103 F.4th 420, 446, *vacated*, 104 F.4th 621, 622 (6th Cir. 2024) (en banc). Yost protested to the en banc court, which granted rehearing and vacated the panel decision, vitiating Plaintiffs' relief. *Brown*, 104 F.4th at 622. We heard this case en banc six days before the November 2024 election. Now, the majority claims it is too late for us to do anything because the requested preliminary injunction is moot. Respectfully, I disagree.

## II. MOOTNESS

Plaintiffs' motion for a preliminary injunction is not moot. Plaintiffs requested a preliminary injunction requiring Yost to "immediately certify Plaintiffs' citizen-initiative entitled 'Protection of Ohioans' Constitutional Rights,' which was submitted to [Yost] on March 5, 2024, to the Ohio Ballot Board for further proceedings under Ohio law." R. 2-1 (Proposed Order) (Page ID #64). Such an injunction is not inextricably tied to the now-past November 2024 election. Moreover, granting this relief would still be meaningful to Plaintiffs. Plaintiffs' petition would move forward in the ballot-initiative process. And, after review from the Ohio Ballot Board, Plaintiffs could begin collecting signatures to place their initiative on a future ballot. Affording Plaintiffs' requested relief would have the "practical effect" of remediating Plaintiffs' First Amendment injury while the case proceeds on the merits.

Under Article III, "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). Accordingly, when intervening events cause parties to lose a "legally cognizable interest in the determination whether [a] preliminary injunction was properly granted [or denied]," the appeal of the preliminary

---

rejection in the Ohio Supreme Court. Recently, after holding in another case that the Ohio Attorney General lacks statutory authority to review titles, *State ex rel. Dudley v. Yost*, 2024-Ohio-5166, 2024 WL 4610503, at *1 (Ohio Oct. 30, 2024), the Ohio Supreme Court granted review in Plaintiffs' case and remanded the untitled version to Yost to conduct a fair-and-truthful review. *See State ex rel. Brown v. Yost*, 2024-Ohio-5388.

No. 24-3354                              *Brown et al. v. Yost*                              Page 27

injunction is moot, and we must vacate and remand for consideration of any remaining issues in the case. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981) (quoting *Ammond v. McGahn*, 532 F.2d 325, 328 (3d Cir. 1976)). In determining whether parties retain a legally cognizable interest in the determination, we consider whether preliminary relief would have any "practical effect" while the lawsuit is pending. *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc).

A preliminary injunction can lose its "practical effect" for three reasons. First, "the terms of the injunction . . . [may] have been fully and irrevocably carried out." *Camenisch*, 451 U.S. at 398. In *Camenisch*, the University of Texas's appeal of a preliminary injunction became moot after the plaintiff student graduated, having received the benefit of a sign-language interpreter ordered by the courts. *Id.* at 393, 398. Second, the defendant may have voluntarily undertaken the requested action with no reasonable possibility of retraction during pendency of the litigation. *Ohio v. U.S. Env't Protec. Agency*, 969 F.3d 306, 308–09 (6th Cir. 2020). Thus, in *Ohio*, the state's application for a preliminary injunction became moot after the EPA repealed and replaced the rule challenged by Ohio, and there was no reasonable possibility that the rule would be reinstated during the pendency of the litigation. *Id.* at 309. Third, intervening events may foreclose the court from granting relief with any practical effect. So, when a plaintiff seeks preliminary relief inextricably tied to a certain election, passage of the election renders the appeal of their preliminary injunction moot. *Thompson v. DeWine*, 7 F.4th 521, 524 (6th Cir. 2021) (per curiam).

Plaintiffs' request for preliminary relief does not fall within any of these categories. Plaintiffs' request for relief has not been mooted by compliance with a prior injunction, nor by defendants' voluntary cessation of the challenged conduct. To the contrary, Yost has not approved Plaintiffs' March 5, 2024 initiative summary. Indeed, he has rejected a subsequently submitted summary. Passage of the November 2024 election also has not precluded us from granting relief. While Plaintiffs' expressed goal was collecting sufficient signatures to place their initiative on the November 2024 general-election ballot, the relief they sought was not inextricably tied to that election. They merely sought an order requiring Yost to "immediately certify Plaintiffs' citizen-initiative," R. 2-1 (Proposed Order) (Page ID #64), which, the parties tell us, would allow Plaintiffs

No. 24-3354            *Brown et al. v. Yost*            Page 28

to proceed in any future election. We require no "time machine" to grant Plaintiffs effective relief for the duration of the litigation. *Thompson*, 7 F.4th at 524.

The majority's disagreement rests on how we construe Plaintiffs' request for relief. According to the majority, Plaintiffs' request for relief turns exclusively on placing this initiative on the ballot for the November 2024 election, which has already passed. *See* Maj. Op. at 4–6. In reaching this conclusion, the majority looks past the actual requested relief—an injunction requiring Yost to "immediately certify Plaintiffs' citizen-initiative," R. 2-1 (Proposed Order) (Page ID #64)—and gives undue weight to other portions of the record.

First, the majority mistakenly focuses on how Plaintiffs justified their request for preliminary relief, rather than on the requested relief itself. The majority correctly notes that Plaintiffs' arguments originally emphasized the need to obtain a preliminary injunction in time to collect 400,000 signatures before the November 2024 election. *See* Maj. Op. at 5. But the impossibility of gaining access to the November 2024 ballot without emergency relief went primarily to Plaintiffs' claim of irreparable harm, not the nature of the relief sought. *See* R. 2 (Mem. of L. in Supp. of Emergency Relief at 19) (Page ID #61).

Second, the majority places too much emphasis on language in the March 5, 2024 draft initiative and summary language, both of which indicate an effective date of January 1, 2025. According to the majority, this language reveals that Plaintiffs' requested relief was targeted exclusively at the November 2024 election. Maj. Op. at 5. Clearly, Plaintiffs' initial goal was to place this initiative on the November 2024 ballot, and emergency relief was required if they would have any chance of doing so. They missed that opportunity after the en banc court vacated the panel majority's order granting a preliminary injunction. Equally clearly, Plaintiffs still endeavor to obtain certification of their initiative and to begin collecting signatures. *See* D. 65 (Pls.' Letter Br. at 4–5). Under these circumstances it is not "impossible" to grant "any effectual relief whatever." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted).

Plaintiffs' appeal of their motion for a preliminary injunction is not moot.

No. 24-3354                          *Brown et al. v. Yost*                          Page 29

## III.  MERITS

Because Plaintiffs' motion for a preliminary injunction is not moot, I would reach the merits.  I continue to believe that Plaintiffs are likely to succeed on the merits of their First Amendment challenge and that preliminary relief is accordingly warranted.

The Supreme Court has made abundantly clear that circulating a petition in support of a ballot initiative is "core political speech."  *Meyer v. Grant*, 486 U.S. 414, 422 (1988).  That is because "circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change."  *Id.* at 421.  While states have "considerable leeway to protect the integrity and reliability of the initiative process," the First Amendment requires us to "guard against undue hindrances to political conversations and the exchange of ideas."  *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191–92 (1999).

Typically, we analyze First Amendment challenges to the ballot initiative process under the framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992) ("*Anderson-Burdick*").  The *Anderson-Burdick* framework requires us to weigh the "character and magnitude of the asserted injury" against the "precise interests put forward by the State as justifications for the burden imposed by its rule."  *Anderson*, 460 U.S. at 789.  The level of scrutiny we apply is determined by the magnitude of the burden.  If the burden is severe, the regulation will be upheld only if it is "narrowly drawn to advance a state interest of compelling importance."  *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).  In addition to the traditional *Anderson-Burdick* analysis, if an election law impacts—directly or indirectly—"core political speech," then that law may be challenged under *Grant* and *American Constitutional Law Foundation*, and their progeny.  For such a law, strict scrutiny is triggered.  *See Am. Const. Law Found., Inc.*, 525 U.S. at 192; *Grant*, 486 U.S. at 425.  When a law crosses clear boundaries between regulating the ballot initiative process and restricting core political speech, we have applied a hybrid approach, considering the "character and magnitude" of the state's law in light of *Grant* and its progeny.  *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 380–87 (6th Cir. 2008).

No. 24-3354                          *Brown et al. v. Yost*                          Page 30

In the panel majority opinion, the panel evaluated § 3519.01 under this hybrid approach, recognizing that the law had aspects of regulation of the initiative process, as well as aspects of a restriction on core political speech. Whether the statute is more akin to a restriction on core political speech or a regulation of the initiative process, in either case direct application of *Grant* or application of the hybrid approach is similar.

The first step under the *Anderson-Burdick* framework is to determine the character and magnitude of Plaintiffs' injury. When determining the character and magnitude of Plaintiffs' injury, we must consider "the combined effect of the applicable election regulations," and not measure the effect of each statute in isolation. *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006). States have the "power to ban initiatives"; however, if initiatives are allowed under state law, states do not have "the power to limit discussion of political issues raised in initiative petitions." *Grant*, 486 U.S. at 425. Circulation of an initiative petition is "core political speech," and restrictions on initiative proponents' ability to advocate for a petition to obtain signatures are "wholly at odds with the guarantees of the First Amendment." *Id.* at 421–22, 428 (quoting *Buckley v. Valeo*, 424 U.S. 1, 50 (1976)). "The First Amendment protects [Plaintiffs'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.* at 424.

In *Grant*, the Court found that the appellees' "core political speech" was restricted by the state's "refusal to permit appellees to pay petition circulators." 486 U.S. at 422. That prohibition "restrict[ed] political expression" because the law "limit[ed] the number of voices who [would] convey appellees' message and the hours they [could] speak," and thereby "limit[ed] the size of the audience they [could] reach." *Id.* at 422–23. Likewise, the Court determined that the state law burdened the appellees' "core political speech" because the law "ma[de] it less likely that appellees w[ould] garner the number of signatures necessary to place the matter on the ballot," such that the appellees were unable to "make the matter the focus of statewide discussion." *Id.* Here, Plaintiffs' summary of their proposed constitutional amendment "involves both the expression of a desire for political change and a discussion of the merits of the proposed change" and, as explained below, Ohio's restrictions implicate the same concerns at issue in *Grant*. *Id.* at 421.

No. 24-3354                          *Brown et al. v. Yost*                          Page 31

The Supreme Court has identified at least two ways that restrictions on "core political speech" impose a severe burden: (1) by restricting one-on-one communication between petition circulators and potential signatories, and (2) by making it less likely that initiative proponents will be able to garner the necessary signatures to be placed on the ballot "thus limiting their ability to make the matter the focus of statewide discussion." *Grant*, 486 U.S. at 422–23. Both burdens are implicated in this case.

First, the law restricts one-on-one communication between petition circulators and potential signatories due to the combined effect of the Ohio Attorney General's content-based review of the petition summary and the lack of timely review of his decision making. The law authorizes the Ohio Attorney General to review the *substance* of Plaintiffs' *summary* of their proposed constitutional amendment. If Yost determines that the summary is misleading, he declines to certify the summary and Plaintiffs must alter their summary to conform to his wishes (petty and self-contradictory as they may be). Should Plaintiffs disagree with his proposed changes, their only recourse is review in the Ohio Supreme Court, which may—as in this case—come only months later. In essence, Plaintiffs must speak in the terms that Yost wants them to speak, or they must wait months or years to begin circulating their petition summary, which "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Grant*, 486 U.S. at 421.

Likewise, the second concern from *Grant*—that Plaintiffs will be less able to garner the necessary signatures to be placed on the ballot "thus limiting their ability to make the matter the focus of statewide discussion," 486 U.S. at 423, is also present here. Without timely review, § 3519.01 allows the Attorney General to reject a summary in perpetuity such that Plaintiffs are never able to *begin* collecting signatures in support, much less garner the number of signatures required. Thus, the time that Plaintiffs will have to speak with potential signatories about the proposed amendment as well as how widely they can convey the message has been meaningfully diminished, if not altogether eliminated.

Because the law imposes a severe burden on Plaintiffs' First Amendment activities, the law can stand only if it survives strict scrutiny, that is, if the government can demonstrate that the law is "justified by a compelling state interest and was narrowly tailored in pursuit of that interest."

No. 24-3354                    *Brown et al. v. Yost*                    Page 32

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). Yost has asserted an interest in "voter education, fraud deterrence, and the integrity of the initiative process and election." D. 19 (Appellee Br. at 35). Those are compelling interests. *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). But the law—and Yost's administration of it—are not narrowly tailored to those interests. At first blush, the law may appear tailored: it limits Yost's discretion to review of the fairness and truthfulness of the summary and gives him just ten days to complete his review before Plaintiffs have a right of action in the Ohio Supreme Court. Yet, the facts of this case tell a different story. Yost has issued multiple denials of Plaintiffs' request for certification, and Plaintiffs have been unable to obtain any meaningful or timely judicial review in the state court. Accordingly, it is not likely that this is the least-restrictive means to satisfy the state's compelling interests. Because Plaintiffs are likely to succeed on their First Amendment claim, I would grant the motion for preliminary injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

## IV.  RESPONSE TO JUDGE THAPAR

Judge Thapar disagrees and argues that Plaintiffs are unlikely to succeed on the merits. His view, as I understand it, rests on the contention that the First Amendment distinguishes between "(1) regulations of citizens' ability to *speak* to one another as part of [the ballot initiative] process; and (2) regulations of citizens' ability to *make law* as part of that process." Thapar Op. at 9–10. He argues that the First Amendment applies to the first but not the second. *Id.* at 10. Accordingly, he would exempt all ballot-initiative regulations from the First Amendment, unless those regulations directly targeted the speech or payment of petition circulators. This position is incorrect as a matter of law, and it does not determine the outcome of this case.

To begin, Judge Thapar is wrong that the First Amendment does not apply to regulations of the ballot-initiative process. The Supreme Court has never cordoned off the ballot-initiative process from First Amendment scrutiny. To the contrary, the Supreme Court has indicated that regulations of the ballot-initiative process should be analyzed in the same terms as other election-related regulations. In *American Constitutional Law Foundation*, the Supreme Court explained that "'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'"

525 U.S. at 192 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *see id.* at 187, 192 n.12; 206–09 (Thomas, J., concurring in the judgment); 215–16 (O'Connor, J., concurring in the judgment in part and dissenting in part).  In setting forth that principle, the Supreme Court relied on its election-law precedents, which apply even to regulations of the mechanics of the election process.  *See id.* at 192 (citing *Storer*, 415 U.S. at 730 (party-affiliation requirements); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) (third-party ballot access); *Anderson*, 460 U.S. at 789–90 (candidate filing deadline)).

Construing the "litmus test" referred to in *American Constitutional Law Foundation* as just a determination whether the law restricts Plaintiffs' ability to express themselves about a ballot initiative, *see* Thapar Op. at 19–20, overlooks the significant expressive aspects of the ballot-initiative process.  The process of proposing a ballot initiative is bound up with the "the expression of a desire for political change and a discussion of the merits of the proposed change." *Grant*, 486 U.S. at 421.  As the First Circuit has explained, "[a] state initiative process provides a uniquely provocative and effective method of spurring public debate on an issue of importance to the proponents of the proposed initiative." *Wirzburger v. Galvin*, 412 F.3d 271, 276 (1st Cir. 2005). Regulations that inhibit petitioners from qualifying their initiative for the ballot "indirectly impact core political speech" by preventing those issues from becoming "'the focus of statewide discussion,'" thereby "'reducing the total quantum of speech on a public issue.'" *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012) (quoting *Grant*, 486 U.S. at 423) (alteration omitted). Additionally, many regulations of the ballot-initiative process—like the regulation at issue in this case—to some degree affect extrinsic First Amendment rights, such as the right to express oneself about a ballot initiative or to associate with others of similar persuasion.  Applying the *Anderson-Burdick* test, as we do in this circuit, *see, e.g.*, *Schmitt v. LaRose*, 933 F.3d 628, 639 (6th Cir. 2019), is well suited to determining the burden those regulations place on rights within and without the ballot-initiative process and allows us to calibrate our review accordingly.  Judge Thapar has identified no binding case law from the Supreme Court that would counsel otherwise.[2]

---

[2]Chief Justice Roberts's brief concurrence in the grant of a stay in *Little v. Reclaim Idaho*, reached only the questions (1) whether it was "reasonably likely" that the Court would grant certiorari to resolve a split among the circuits concerning the application of First Amendment scrutiny to "neutral, procedural regulation[s] [that] inhibit[] a person's ability to place an initiative on the ballot," and (2) whether there was a "fair prospect that the Court [would]

No. 24-3354                          *Brown et al. v. Yost*                          Page 34

Even assuming that a bright line should be drawn between regulation of the ballot-initiative process and regulation of speech about ballot initiatives, the facts of this case indicate that § 3519.01 falls on the speech-regulation side of the line. Recall what is at issue here: a summary of a proposed ballot initiative. The summary is not the text of the initiative, nor is it the language that will appear on the ballot, *see* Ohio Rev. Code § 3505.06(E); it is a description of the proposed amendment that appears only on the petition that voters sign to place the measure on the ballot, *id.* § 3519.05(A). It is an important tool, Plaintiffs tell us, to spread the message and advocate for their cause. *See* D. 44 (Pls.' En Banc Suppl. Br. at 11 (contending that "[u]nlike language that appears on the ballot or in the text of the proposed legislation, which might properly be considered government speech, the summary at issue here is used only during circulation of the petition. Written by Plaintiffs, the summary is their political speech advocating for their proposed change . . . .")). Judge Thapar does not address the distinction between the summary and the initiative itself. Instead, he collapses the summary with the initiative language when he states that "when the government regulates the content of initiative petitions and their summaries . . . it's regulating what sorts of laws citizens can enact." Thapar Op. at 11; *see id.* at 15 (contending that when "Yost enforces the fair-and-truthful certification provision, he isn't directly regulating speech; he's restricting what sorts of citizen initiative proposals can become law"). But the summary is *not* a law that citizens enact. It is political expression, over which the Attorney General has attempted to exercise editorial control.

That the summary might have some legal significance considering its placement on the petition does not negate its expressive nature. In *Doe v. Reed*, the Supreme Court addressed whether forced disclosure of a referendum petition—specifically, the names and contact information of the signatories—implicated the First Amendment. 561 U.S. 186, 194–95 (2010). The Secretary of State argued that "signing a petition is a legally operative legislative act and therefore 'does not involve any significant expressive element.'" *Id.* at 195 (citation omitted). The Court expressly rejected this argument, reasoning that it did "not see how adding such legal effect to an expressive activity somehow deprives that activity of its expressive component" particularly

---

set aside" a court order applying such scrutiny. 140 S. Ct. 2616, 2616–17 (2020) (Roberts, C.J., concurring in the grant of stay).

No. 24-3354                          *Brown et al. v. Yost*                          Page 35

because "the signature expresses a particular viewpoint." *Id.* ("Petition signing remains expressive even when it has legal effect in the electoral process."). So too here. The summary of the proposed ballot initiative expresses at least the viewpoint that its proponents think "that the question should be considered 'by the whole electorate,'" and "adding such legal effect to an expressive activity" does not "deprive[] that activity of its expressive component." *Id.* (quoting *Grant*, 486 U.S. at 421).[3]

Judge Thapar also attempts to wipe away the First Amendment implications by pointing to statutes from other states that, he suggests, indicate that "Ohio isn't in a league of its own" by authorizing content-based review of the petition summaries. Thapar Op. at 11. But the authority on which he relies provides scant support for his position. For example, the Montana and Maine statutes he cites authorize officials to review language that will appear on the ballot itself or become law, not summaries of laws that petitioners propose. *See, e.g.*, Mont. Code Ann. § 13-27-212, 213, 226(1)–(3) (ballot statements and "yes and no" statements that appear on ballot); Me. Rev. Stat. Ann. Tit. 21-A, § 901(3-A) (bill titles and headnotes that form part of proposed law). Contrary to Judge Thapar's contention, amici inform us that Ohio is unique in the discretion that it affords the attorney general to "judge the content of proposed amendment summaries, placing his opinion between citizens seeking constitutional change and the voters they want to speak to." D. 49 (Br. of Direct Democracy Scholars et al. Supp. Pls. & Reversal at 10). Judge Thapar's citations to out-of-circuit cases upholding restrictions on the subject matter of ballot initiatives are similarly inapposite. *See* Thapar Op. at 11–13.

Perhaps to assuage concerns about the First Amendment implications of this case, Judge Thapar emphasizes that Ohio does not "bar someone from engaging in 'unfair' or 'untruthful' conversations when they are seeking signatures on the campaign trail." Thapar Op. at 14. Nor does Ohio prevent Plaintiffs from circulating some petition or engaging with fellow citizens on the

---

[3]Judge Thapar's argument that this case is "the inverse of *Doe*" rests on the mistaken contention that Plaintiffs' injury is merely the state's refusal to give legal effect to their speech. *See* Thapar Op. at 21–22. As I explain above, Yost's continued refusals to certify the ballot-initiative summary burdens Plaintiffs' ability to circulate their initiative petition and to use their chosen speech to describe the proposed amendment. That Plaintiffs can additionally circulate a summary of their own writing does not vitiate the burden imposed by Ohio law and Yost's conduct here.

topic of eliminating state qualified immunity. *Id.* The trouble with this argument is that the Supreme Court has already rejected it: "[t]hat [Plaintiffs] remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection." *Grant*, 486 U.S. at 424. "The First Amendment protects [Plaintiffs'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.*

\*      \*      \*

In closing, I note that the need for a preliminary injunction is especially acute here. Yost has rejected Plaintiffs' summaries time and time again, for reasons that appear increasingly specious. Meanwhile, Plaintiffs have been unable even to begin circulating their petition. Because Plaintiffs' motion for a preliminary injunction is not moot and because they are likely to succeed on the merits of that motion, I would grant relief. I respectfully dissent.

No. 24-3354            *Brown et al. v. Yost*            Page 37

—————————————

**DISSENT**

—————————————

KETHLEDGE, Circuit Judge, dissenting. I write to offer an additional reason why this case is not moot. Some eight times now, on grounds increasingly dubious, Ohio's Attorney General has refused to certify any iteration of the plaintiffs' summaries of their proposed amendment to the Ohio Constitution. Eventually the plaintiffs moved in the district court for a preliminary injunction requiring that the AG "immediately certify" the summary they submitted to him "on March 5, 2024." Mot. at 1. The district court denied that motion. The result has been that, for about 21 months now, the plaintiffs have not been able to circulate their petitions—which is itself core political activity protected by the First Amendment. *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 186–87 (1999).

We could change that status quo tomorrow, by ordering the AG to approve the March 2024 summary. That was the injunction the plaintiffs requested; and that request by its terms was not limited to purposes of the 2024 election. *See* Mot. at 1. Moreover, all the signatures the plaintiffs obtain would undisputedly remain valid for as long as it takes them to obtain the number of signatures required by Ohio law; and the plaintiffs want to start collecting those signatures now. It is therefore not "impossible" for us to grant the plaintiffs "effectual relief" in this appeal. *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992). By any practical measure, the contrary is true; and the State and plaintiffs alike, for their part, both say this appeal remains live.

Nothing in the March 2024 summary itself changes these conclusions. True, that summary states—in the last sentence of many—that the proposed amendment "shall take effect on January 1, 2025." Compl. Ex. 3, at 2. And that effective date is no longer accurate, given that the recent election has already passed. But that detail—to the extent it has any legal significance in the first place—does not leave us without means of providing these plaintiffs with effectual relief. When adjudicating a request for an injunction, a federal court exercises "the power of a court of equity[.]" *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932). And courts of equity arose in large part

No. 24-3354 *Brown et al. v. Yost* Page 38

to address inequities wrought by ministerial details like this one. *See, e.g.*, *Hall v. Meisner*, 51 F.4th 185, 191–92 (6th Cir. 2022).

We can address the detail of the effective date here. Federal courts craft preliminary injunctions rather than merely approve them. And "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). "In the course of doing so," moreover, "a court 'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'" *Id.* at 580 (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)). Here, striking the summary's last sentence (and, if need be, the same sentence from the amendment itself)—as part of an injunction requiring the AG to certify the summary—would be enough to remove the inaccurate effective date. We have authority to make that revision: a federal court can "modify an injunction in adaptation to changed conditions[.]" *Swift & Co.*, 286 U.S. at 114.

We therefore face no impossibility of granting effectual relief here. To the contrary, we can both craft and enter an injunction that allows the plaintiffs to begin collecting signatures for their ballot initiative—which is the relief they have been seeking to this day. I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-3354

CYNTHIA BROWN; CARLOS BUFORD; JENNY SUE ROWE,

    Plaintiffs - Appellants,

      v.

DAVID YOST, in his official capacity as Ohio Attorney General,

    Defendant - Appellee.

> **FILED**
> Nov 21, 2024
> KELLY L. STEPHENS, Clerk

Before:  SUTTON, Chief Judge; MOORE, CLAY, GRIFFIN, KETHLEDGE,
STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER,
MURPHY, DAVIS, MATHIS, BLOOMEKATZ, and RITZ, Circuit Judges.

# JUDGMENT

On Petition for Rehearing En Banc

    UPON CONSIDERATION of the petition for rehearing en banc and the supplemental briefs and arguments of counsel,

    IN CONSIDERATION THEREOF, it is ORDERED that the appeal is DISMISSED AS MOOT and the district court's order denying the plaintiffs' motion for a preliminary injunction is VACATED.

**ENTERED BY ORDER OF THE COURT**

_____

Kelly L. Stephens, Clerk